**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3715-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MELVIN C. BANKS,

    Defendant-Appellant.

_____

Argued May 27, 2026 – Decided June 30, 2026

Before Judges Gilson, Firko and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 23-09-0782.

Ethan Kisch, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ethan Kisch, of counsel and on the briefs).

Michelle Ghali, Assistant Prosecutor, argued the cause for respondent (Robert J. Carroll, Morris County Prosecutor, attorney; Michelle Ghali, of counsel and on the brief).

PER CURIAM

Defendant Melvin C. Banks and co-defendant Daniel Lind were charged with robbing D.Z.[1] at Tristate Luxury Rentals (Tristate) in Riverdale. A jury convicted defendant under a second superseding Indictment No. 23-09-0782[2] of second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2(a)(1) (count one); first-degree robbery as an accomplice, N.J.S.A. 2C:15-1(a)(2) (count two); third-degree theft, N.J.S.A. 2C:20-3(a) (count three); and first-degree witness tampering, N.J.S.A. 2C:28-5(a)(2) (count four).

The court granted the State's motion to sentence to an extended term and imposed an aggregate sentence of fifty years' imprisonment subject to the No

---

[1] We use initials for the victim and another individual to protect their privacy interests. R. 1:38-3(c).

[2] Defendant was initially charged under Indictment No. 22-05-0281 with: first-degree armed robbery, N.J.S.A. 2C:15-1(a)(2) (count one); second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 (count two); second-degree burglary, N.J.S.A. 2C:18-2(a)(1)(b)(2) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count five); third-degree theft, N.J.S.A. 2C:20-3(a) (count six); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count seven). Thereafter, defendant was charged under superseding Indictment No. 23-02-0137 with: second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 (count one); first-degree robbery, N.J.S.A. 2C:15-1(a)(2) (count two); third-degree theft, N.J.S.A. 2C:20-3(a) (count three); and first-degree witness tampering, N.J.S.A. 2C:28-5(a)(2) (count four), based on messages he sent to D.Z. from March 9, 2022 through May 14, 2022.

Early Release Act (NERA), N.J.S.A. 2C:43-7.2. On count one, defendant was sentenced to ten years' imprisonment subject to NERA, which was merged into count two. On count two, defendant was sentenced to thirty-years' imprisonment, also subject to NERA but to run consecutive to count four; on count three, defendant was sentenced to five-years' imprisonment to run concurrent to all counts under the indictment, as well as a one-year suspension of his driver's license; and on count four, defendant was sentenced to twenty years flat to run consecutive to count two.

Defendant appeals from his convictions and sentence. We affirm the convictions and sentence but remand for correction of the judgment of conviction (JOC) because the court merged count one into count two but then imposed a sentence on count one. The State correctly concedes that the sentence on count one should be vacated because that conviction was merged into count two.

## I.

We derive the following facts from the record, including the evidence presented at trial.

## The Days Leading Up To The Robbery

On November 19, 2021, defendant went to Tristate, a car rental company, and rented a white Mercedes sedan from D.Z., an owner of Tristate. Defendant observed D.Z. wearing a $50,000 Audemars Piguet watch and took two photographs of him, his watch, and stacks of money on D.Z.'s desk.

Five days later, on November 24, 2021, defendant sent a text message to an unknown number, ostensibly his wife, that read: "You let her know nobody vacate nothing, she's going to get her money for both rents one shot." Thereafter defendant contacted D.Z. and extended his Mercedes rental to December 4, 2021. D.Z. testified that defendant was expected to pay the balance owed for the extended days when he returned the Mercedes. On that day, a Sunday, D.Z. was not working, but he was responsive to tasks such as a customer's return of a rental car.

## The Robbery

On December 4, 2021, the day he was expected to return the car, defendant took a photograph of the Tristate building on his cell phone. At 6:16 p.m., defendant and Lind went to a Home Depot in the Riverdale area. Multiple video cameras captured the two together, with defendant wearing a denim "Playboy" jacket. A receipt, paid for by Lind, listed the purchases, which included a twenty

4

pack of cable ties and black nitrate gloves, which were the same type of gloves worn three hours later in the armed robbery of D.Z.

At 6:58 p.m., defendant and Lind went to an Applebee's restaurant in Butler, approximately one minute away from Tristate, where they stayed for over an hour. Cameras captured the two together in and around Applebee's, and there was a receipt of their meal, which Lind paid at 7:52 p.m. The Mercedes GPS tracker confirmed the vehicle was present at both locations at these dates and times. During that evening, defendant texted D.Z. about returning the Mercedes, and they agreed to a 9:00 p.m. return time. D.Z. proceeded to Tristate around 8:30 p.m., and while he was on his way, he checked the tracking information on the Mercedes, which showed it was in Riverdale, and texted defendant.

At the time defendant was supposed to return the Mercedes, Lind went inside the building. Tristate surveillance footage depicted a white sedan matching the description of the Mercedes drop off an individual outside of the building. Defendant remained across the street from D.Z.'s business in the Mercedes. A witness observed the Mercedes idling in the area outside of Tristate with its lights off. This witness flashed his high beams, signaling to the Mercedes to turn its lights on, but the car simply continued to idle.

A-3715-23

At 9:13 p.m., approximately eighteen minutes before Lind went into the Tristate building, defendant took two photographs of a Taurus TCP semi-automatic pistol using his cell phone. This handgun was never recovered. At 9:30 p.m., footage from a nearby apartment complex showed a white sedan parked in the apartment building's parking lot. Shortly after 9:30 p.m., Lind went into the Tristate building wearing all black, including a mask and gloves, and holding a handgun. Lind took D.Z.'s watch and a Cuban link necklace (each worth $40,000-$50,000), and two iPhones.

During this encounter, Lind shot a bullet into the floor about a foot away from D.Z. The bullet left a 7.65-millimeter shell casing and bullet fragments near D.Z.'s desk. This shell casing was later recovered from the scene by law enforcement. After D.Z. turned over his jewelry, Lind ran out of the building with the stolen items and entered the Mercedes. The same witness who saw the Mercedes idling outside of Tristate also observed Lind flee from the building and enter the passenger side of the Mercedes while cradling an object. The witness watched the car speed off and called 9-1-1. After Lind left in defendant's Mercedes, D.Z. ran to the nearest house to call the police. Data from defendant's cell phone showed him navigating to 12 Cornelius Way in Franklin at 11:58 p.m. A few weeks later, data gathered from defendant's cell phone showed him

6

navigating to the same address. In April 2022, police also observed defendant leaving the same address and surmised he lived in the area.

## Defendant's Post-Robbery Conduct

Two hours after the robbery on December 4, 2021, and over the next two days, the record shows defendant searched high-end jewelry retailers, including Audemars Piguet Watches, the "it's hot" website, and conducted web searches, including "Check AP watch serial number," "J16019 AP watch," "Royal Oak AP watches 17330," and "fake AP watch versus real." Defendant's cell phone had a photograph of a screenshot from Etsy of an "Audemars Piguet Offshore 18K Gold/SS Iced Out 30K Multicolored Dial Diamond," listed for $50,000. There were two additional photographs of watches with amounts listed of $31,999 and $48,000, and one had "AP" on its face, meaning Audemars Piguet. Defendant also searched the watch's serial number.

## Recovering the Mercedes

Defendant never returned the Mercedes he rented from D.Z. Instead, the Mercedes was recovered by law enforcement at approximately 1:00 a.m. the day after the robbery on Cornelius Way in Franklin. Several items were found in the Mercedes, including a black glove, two plastic bottles that contained defendant's DNA, a black disposable mask—containing DNA from defendant, a

jacket, a cell phone, and a red box containing a health insurance card and an eye doctor receipt with the initials "R.M." Law enforcement investigated R.M., ultimately concluding R.M. was defendant's nephew. However, R.M.'s number was saved in his cell phone under the name "Charlene," R.M.'s mother. R.M. was seventeen years old at the time and lived with defendant's sister, Charlene. R.M. was never contacted by the police about the incident.

On January 17, 2022, Detective Gary Keil of the Riverdale police department called defendant on a cell phone number provided to them by D.Z. and advised he was inquiring about an investigation involving the Mercedes he rented. Keil testified that defendant was unhelpful and "standoffish." According to Keil, when he asked defendant about the Mercedes, he responded, "why are you talking about a stolen car?" but Keil never used the word "stolen."

Minutes after defendant hung up the call with Keil, he called D.Z. and asked him why the police were calling him. Keil called defendant again using the same number, however, he did not answer. On February 3, 2022, when Keil called another one of defendant's phone numbers, also provided by D.Z., defendant answered. Keil testified defendant was again "kind of belligerent, standoffish." When Keil told defendant there was paperwork for him, defendant responded he "had a good attorney." On February 28, 2022, Lind was arrested.

8

<u>Defendant's Witness Tampering Of D.Z.</u>

On various dates between March 9 and April 7, 2022, D.Z. received fourteen text messages threatening him and his family if he did not drop the charges. On March 9, 2022, D.Z. received a text saying "Yo" followed by D.Z.'s name. Thereafter, D.Z. received the following messages:

> • "Doesn't [m]atter who I am it's what I do listen drop all charges I'm not going to say it again any law gets involved that's on you how you want this to go because I have all your information and family information all businesses all addresses I won't tell you this again understand me you and family have to go to ya businesses police can't help that just drop the charges been watching you and your family for a good amount of time this is not a threat but do the right thing today and drop those charges next conversation should be I dropped all charges other than that I will pay some one a visit school work you doesn't matter and if you think I'm bluffing you rat I'll prove you wrong police can't save you so drop all charges today."
>
> • "You think I'm playing."
>
> • "You go to anymore law enforcement about this conversation was ever had it a be a bigger problem."
>
> • "See you got caught up with the wrong people drop them charges cause if not the same way they go down you going be f[*]cked remember that little rat."
>
> • "I have every nj address and this will be just like a movie."

• A text listing D.Z.'s home address and another stating "Nice house."

• "Listen you all in the paperwork police already told on you stupid like I said make it right that's all I'm telling you or else it's an issue if you don't drop them charges and think I'm bluffing you'll never see it coming so you can play stupid all you want to an ima show you."

• "Ima show you how big boys play in these streets rat."

• "Before I lose some one to a chump like you to jail I'll hurt you real bad and your mom's so I dear [sic] you to run back to police and say we conversated about anything you better tell district attorney them clown a[**] police and say you wanna drop all charges."

On March 14, 2022, D.Z. went to the Morris County Prosecutor's Office (MCPO) to report the text messages, where he met with Detective Mark Ferraro. While there, D.Z. received another text, which read: "I hope you told them drop all charges." On April 7, 2022, D.Z. received a final text stating, "I see you don't listen, so imma show you how long my arm is today." After tracking the number through two companies, the MCPO determined the number belonged to defendant and that he was using an application contracted with a third-party phone number wholesaler. On April 18, 2022, at 12:47 a.m., defendant's cell phone data also showed he entered D.Z.'s cell phone number into a website that

10

provides access to information such as "e-mail [] addresses, family members associated with certain people, with their phone numbers."

Defendant's Arrest

On April 21, 2022, defendant was arrested. At the time of his arrest, defendant was wearing a Playboy jacket that looked like the one he wore the night of the robbery and was in possession of two cell phones. The first phone was an iPhone with the device's name set to defendant, an Apple ID with the name, "banksmoney11@icloud.com," two cell phone numbers, two SIM cards, and the phone application "TextFree," which allows users to use a different cell phone number. Data revealed defendant accessed the application in March, April, and December 2021, showing a user named "Banks" with an email address "bricoh12@gmail.com."

The second iPhone had the device's name set to "Banksmoney iPhone," the Apple ID as "banksmoney11@icloud.com," two cell phone numbers, and two SIM cards. The cell phone also had a CarPlay account, which connected to a Mercedes on December 4, 2021, and a map application that had searched for 12 Cornelius Way at 11:58 p.m. on December 4, 2021. A contact listed with D.Z.'s first name was created on December 5, 2021.

11

The second cell phone also had the TextFree application containing the outgoing message defendant sent on November 24, 2021, which read: "You let her know nobody vacate nothing, she's going to get her money for both rents one shot." Information also showed defendant's cell phone connected to the Mercedes through its infotainment system on November 20, 2021, the day after he rented the car and on December 4, 2021, the day of the robbery. Photographs were also extracted from the iPhone, including one depicting a Taurus TCP semi-automatic handgun taken on the evening of the robbery.

On May 18, 2022, defendant and Lind were charged under Indictment No. 22-05-0281. After Lind pled guilty to first-degree robbery and second-degree unlawful possession of a weapon, defendant was charged in superseding Indictment No. 23-02-0137 and then a second superseding Indictment No. 23-09-0782.

The Trial

A six-day jury trial was held in February 2024. The State presented twenty-one witnesses. D.Z. testified that he could not recall if the gun pictured on defendant's cell phone was the gun used to rob him. D.Z. also testified that the anonymous messages he received were "threatening" and made him feel "afraid" and "scared" for himself and his family.

A-3715-23

The State presented evidence from William Stitt, who was qualified as an expert in firearms identification. Stitt testified about the parts of the bullet fragments, including a casing, recovered at the scene. He examined the photograph of a gun and identified it as a Taurus TCP semi-automatic pistol based on its markings. However, Stitt testified the gun could not be exclusively identified as the gun used in the armed robbery nor could it be eliminated. A photograph of the gun marked S-132 was admitted into evidence by Detective Mark Rodgers, who testified as to the methodology used to extract metadata from defendant's phone.

Over defense counsel's objection, the court permitted Stitt to testify he could not identify the specific gun model pictured because "the model number designation would have been on the other side of the firearm that was not visible in the photograph." However, Stitt explained that Taurus manufactures two different TCP models: the PT 738, which is a .38 caliber, and the PT 732, which is a .32 caliber. Stitt testified the PT 732 model can fire a 7.65-millimeter bullet, but the PT 738 model cannot. Defendant did not testify and did not present any witnesses.

13

The jury found defendant guilty on all four counts. The court granted the State's motion to sentence defendant as a persistent offender to an extended term pursuant to N.J.S.A. 2C:44-3(a). This appeal followed. Thereafter, defendant filed a motion to access Lind's pre-sentence report, which was denied. On May 27, 2026, we granted the State's unopposed motion to supplement the record.

Before us, defendant argues:

POINT I

REVERSAL IS REQUIRED BECAUSE THE COURT PERMITTED THE STATE'S EXPERT TO PROVIDE CONFUSING, PREJUDICIAL, AND SPECULATIVE NET OPINION TESTIMONY.

POINT II

REVERSAL IS REQUIRED BECAUSE THE COURT FAILED TO INSTRUCT THE JURY ON THIRD[-]PARTY GUILT. (Not raised in the Law Division)

POINT III

REVERSAL IS REQUIRED ON COUNTS ONE AND TWO BECAUSE THE JURY INSTRUCTION ON ACCOMPLICE LIABILITY FOR FIRST-DEGREE ROBBERY WAS INADEQUATE. (Not raised in the Law Division)

<u>POINT IV</u>

REVERSAL IS REQUIRED ON COUNT FOUR BECAUSE THE JURY INSTRUCTION ON FIRST-DEGREE WITNESS TAMPERING WAS INCONSISTENT WITH THE FIRST AMENDMENT AND STATE CONSTITUTION'S FREE SPEECH PROTECTIONS.  (Not raised in the Law Division)

A.   Because [Defendant] Was Prosecuted For Witness Tampering Based On The Content Of His Speech, The Jury Was Required To Find That His Speech Fell Into A Recognized Category Of Unprotected Speech.

B.   Because This Was A Tampering Prosecution Based On "True Threats," <u>Counterman</u>[3] And <u>Fair</u>[4] Required That The Jury Should Have Been Instructed On Both A Higher Mens Rea And Objective Victim Standard Than Required By The Model Charge Given Here.

C.   In The Alternative, Even If This Was A "Speech Integral To Criminal Conduct" Prosecution, <u>Hill</u>[5] Required That The Jury Should Have Been Instructed That It Needed To Find That [Defendant] Intended His Text Messages To Cause D.Z. To Withhold Any Testimony, Information, Document, Or Thing.

---

[3]  <u>Counterman v. Colorado</u>, 600 U.S. 66 (2023).

[4]  <u>State v. Fair</u>, 45 N.J. 77 (1965).

[5]  <u>State v. Hill</u>, 256 N.J. 266 (2024).

15

POINT V

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DENIED [DEFENDANT] DUE PROCESS AND A FAIR TRIAL. (Not raised in the Law Division)

POINT VI

IN ANY EVENT, [DEFENDANT] IS ENTITLED TO RESENTENCING.

A.  The Jury—Not The Court—Needed To Make The Relevant Factual Findings Regarding Extended-Term Eligibility.

B.  The Court Failed To Consider The Substantial Disparity In [Defendant's] Punishment For First-Degree Robbery—A [Thirty]-Year Term With A 25.5-Year Parole-Bar—And That Of His Co-Defendant For The Same Crime—An [Eight]-Year Term With A 6.8-Year Parole Bar.

C.  The Court Merged Count [One] Into Count [Two], So The JOC Must Be Corrected.

II.

We first address defendant's contention that the court erred in permitting the State's firearms expert, Stitt, to provide allegedly confusing and prejudicial net opinion testimony under N.J.R.E. 403(a) and 703. Defendant maintains Stitt's testimony was neither relevant nor probative under N.J.R.E. 401, and reversal is required.

16

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). An appellate court applies "[a] deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." Id. at 53 (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011)).

During Stitt's direct testimony, defense counsel asked for a sidebar and told the court, "I have a feeling this is going where it shouldn't be going." In response, the State proffered Stitt would testify that, because the photograph did not reveal the handgun's model type, the gun could have fired the 7.65-millimeter round in question, but it could also not have fired the round. In other words, the expert will be "opining to that if it's Model A it can fire a 7.65, and if it's Model B it couldn't." Defense counsel countered "[t]here's no value to that testimony" because the expert's conclusion is essentially "[a]nything's possible," representing that either the gun can shoot a 7.65-millimeter shell casing or it cannot.

The court expressed similar concern, telling the prosecutor: "[t]he difficulty [the court has] is you're trying to make the leap that this [gun] could or could not fire the [bullet]. That's not helpful." The prosecutor responded

7.65-millimeter shell casings are rare, which makes the testimony probative. Specifically, the prosecutor stated, "[t]he 7.65 caliber [sic] shell casing is a pretty rare type of . . . shell casing. There are only a certain amount of guns that can [shoot it]," and "[T]his is just a rare type of shell casing." "Stitt is not saying that this gun couldn't fire it [at] all, which is a lot, as most guns cannot fire this type of shell casing." Over objection, the court permitted Stitt's testimony, and in relevant part Stitt testified:

> PROSECUTOR: And can you describe what 7.65 [-]millimeter ammunition is? Is it common, is it rare, is it something else?
>
> STITT: It's common. Basically they're interchangeable. The . . . 7.65[-]millimeter basically . . . was designed for the European market, that's the metric designation for millimeter, whereas the .32 caliber was for the U.S. market . . .
>
> PROSECUTOR: . . . So one model Taurus TCP, that you talked about earlier, could fire a 7.65[-]millimeter shell, is that accurate?
>
> STITT: The other model of the manufacturer would not.
>
> PROSECUTOR: Okay. So one of the models that Taurus makes could fire a 7.65, but the other model could not, is that accurate?
>
> STITT: Yes.

18

PROSECUTOR: Okay. And in the photograph that you saw you indicated that was a Taurus TCP.

STITT: Yes.

PROSECUTOR: But is it accurate that you can't tell exactly which model it is because the model number's on the other side of the . . .

STITT: Correct. I was not able to see the model designation.

On redirect, the prosecutor asked Stitt whether the handgun depicted in the photograph could fire a 7.65-millimeter, and Stitt replied, "Yes, it is possible." On re-cross, when asked whether he could, to "a reasonable degree of certainty," tell "whether or not that weapon can fire that [7.65-millimeter] round or not," Stitt conceded, "No I don't know the model number so, therefore, I could not."

Here, defendant contends that Stitt's testimony was speculative and should have been barred as a net opinion. Defendant asserts Stitt testified that the 7.65-millimeter casing is "common," as opposed to "rare," contrary to the prosecutor's proffer at sidebar. Without this "hook," defendant contends Stitt's testimony provided no probative value and was harmful because it suggested to the jury that there was a "fifty percent chance" the gun depicted in the photograph fired the shell casing and amounted to an opinion that "anything's possible."

19

N.J.R.E. 702 permits a trial court to admit expert testimony, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 703 requires an expert's opinion be "based on 'facts or data derived from (1) the expert's personal observations, . . . (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject.'" State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Richard Biunno, New Jersey Rules of Evidence § 896 (2005)). "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding." N.J.R.E. 703.

"The net opinion rule . . . 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" State v. Burney, 255 N.J. 1, 23 (2023) (quoting Townsend, 221 N.J. at 53-54). The rule "is succinctly defined as 'a prohibition against speculative testimony.'" Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v.

20

Pfeifer, 302 N.J. Super. 563, 580 (App. Div. 1997)).  Therefore, "[a]n expert's conclusion 'is excluded if it is based merely on unfounded speculation and unquantified possibilities.'"  Townsend, 221 N.J. at 55 (quoting Grzanka, 301 N.J. Super. at 580).  Our Supreme Court has warned, "when an expert speculates, he [or she] ceases to be an aid to the trier of fact and becomes nothing more than an additional juror."  Ibid. (quoting Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996)).  Thus, "[g]iven the weight that a jury may accord to expert testimony, a trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record."  Ibid.

N.J.R.E. 402 states "[a]ll relevant evidence is admissible, except as otherwise provided in these rules or by law."  Relevant evidence "means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action."  N.J.R.E. 401.  "Relevancy consists of probative value and materiality."  State v. Buckley, 216 N.J. 249, 261 (2013) (emphasis added).  "Probative value is the tendency of the evidence to establish the proposition that it is offered to prove."  Ibid.  "A material fact is one which is really in issue in the case."  Ibid. (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)).  N.J.R.E. 403 states, "relevant evidence

may be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury[.]"

Applying these principles to the matter before us, we conclude it was appropriate for Stitt to opine as to what model the gun in the photograph may have been. Moreover, Stitt utilized his specialized expertise to explain how each gun model can be distinguished by their individualized ability or inability to fire the type of bullet found at Tristate following the armed robbery.

We reject defendant's contention that Stitt's testimony was a net opinion, as Stitt "supported his conclusion with specific reasoning which the jury could accept or reject." Molino v. B.F. Goodrich Co., 261 N.J. Super. 85, 99 (App. Div. 1992). Stitt candidly admitted that he was unsure what model gun was depicted in the photograph. However, Stitt explained the characteristics of the two different models and how he was able to identify either model based on the specific factor that differentiated one model of gun from another model.

Importantly, Stitt did not conclude which model he believed was depicted in the photograph or that the gun in the photograph was the one Lind used in the armed robbery. Instead, Stitt's testimony was "supported by factual evidence," which included the photograph of the handgun and the bullet casing found at Tristate and utilized his expertise to evaluate evidence to form his opinion.

Burney, 255 N.J. at 23 (quoting Townsend, 221 N.J. at 53-54). Stitt's testimony was admissible to address a fact in issue and assisted the jury in deciding whether there was circumstantial evidence that defendant conspired with Lind to commit an armed robbery—specifically with a handgun—and whether defendant was an accomplice. The jury was permitted to give Stitt's testimony whatever weight it chose.

Further, even if the gun depicted in the photograph was not the gun used in the robbery, Stitt's testimony was helpful to the jury in considering whether defendant had the requisite intent to use a gun, especially in light of the fact the photograph was taken using defendant's cell phone eighteen minutes before the robbery occurred. Stitt's testimony was also relevant for the jury to determine whether defendant had knowledge the gun would be used in the armed robbery. Thus, the court did not abuse its discretion under N.J.R.E. 401 or 403(a) in admitting Stitt's testimony.

### III.

Next, defendant argues that he was denied a fair trial when the court failed to give the model jury charge for third-party guilt. Defendant contends he did not drive Lind either to or from the robbery and claims his attorney presented evidence of the actual driver's identity. In particular, defendant asserts that

23

during summation, his attorney argued R.M. was the driver. Defendant maintains two detectives testified they found R.M.'s health insurance card and "a patient copy of an eye doctor's receipt" that had the initials "R.M." on them, along with a different address, date of birth, and a phone number, in the Mercedes.

Despite discovering these items, the detectives did not contact R.M. Defendant maintains the jury was presented with two competing theories, and the court's failure to provide the model jury charge for third-party guilt constituted plain error. Defendant urges the court should have informed the jury that it was not required to find R.M. participated in the robbery but merely that there was a reasonable doubt R.M. was involved.

"It is axiomatic that appropriate jury instructions are essential for a fair trial." State v. Ball, 268 N.J. Super. 72, 112 (App. Div. 1993). Where a defendant does not request an instruction or object to the lack of one, the trial court's actions are reviewed under a plain error standard. State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2; R. 1:8-7(b). The defendant must demonstrate a legal impropriety in the charge that prejudiced substantial rights in such a "grievous" manner that "the error possessed a clear capacity to bring about an unjust result[,]" State v. Hock, 54 N.J. 526, 538 (1969), meaning the error "led the jury

24

to a result it otherwise might not have reached." State v. Jenkins, 178 N.J. 347, 361 (2004) (quoting State v. Brims, 168 N.J. 297, 306 (2001)).

The model jury charge for third-party guilt provides:

> The defendant contends that there is evidence before you indicating that someone other than he or she may have committed the crime or crimes, and that evidence raises a reasonable doubt with respect to the defendant's guilt.
>
> In this regard, I charge you that a defendant in a criminal case has the right to rely on any evidence produced at trial that has a rational tendency to raise a reasonable doubt with respect to his/her own guilt.
>
> I have previously charged you with regard to the State's burden of proof, which never shifts to the defendant. The defendant does not have to produce evidence that proves the guilt of another, but may rely on evidence that creates a reasonable doubt. In other words, there is no requirement that this evidence proves or even raises a strong probability that someone other than the defendant committed the crime. You must decide whether the State has proven the defendant's guilt beyond a reasonable doubt, not whether the other person or persons may have committed the crime(s).
>
> [Model Jury Charges (Criminal), "Third[-]Party Guilt Jury Charge" (approved Mar. 9, 2015) (emphasis added).]

In the matter under review, the omission of the model third-party guilt charge was not sufficiently "grievous" that it "possessed a clear capacity to bring about an unjust result." Hock, 54 N.J. at 538. The jury was well aware that

25

defendant had presented a theory of third-party guilt and was instructed repeatedly about the State's burden to show defendant, not anyone else, was guilty beyond a reasonable doubt.  There was also overwhelming evidence in the record supporting the jury's finding beyond a reasonable doubt that defendant drove the Mercedes and was an accomplice to Lind's armed robbery. Thus, we discern no plain error under Rule 2:10-2.

IV.

We next address defendant's contention that the court improperly instructed the jury on accomplice liability.  The State alleged defendant aided, agreed to aid, or attempted to aid Lind's committing first-degree robbery. However, for the first time on appeal, defendant asserts the court erred in failing to specifically instruct the jury that to convict him, the jury must find he not only shared Lind's intent to commit robbery but also shared the specific intent to commit robbery with a deadly weapon, citing State v. Weeks, 107 N.J. 396, 405-10 (1987).

To convict defendant of first-degree robbery as an accomplice, the jury had to find that defendant shared Lind's purpose in committing the robbery with "a deadly weapon," here, a gun.  See N.J.S.A. 2C:15-1(b) (stating robbery "is a crime of the second degree, except that it is a crime of the first degree if in the

course of committing the theft[,] the actor . . . is armed with, or uses . . . a deadly weapon").

A person is guilty of the offense as an accomplice if he, or she, "[w]ith the purpose of promoting or facilitating" the commission of the offense: "(a) [s]olicits such other person to commit it; (b) [a]ids or agrees or attempts to aid such other person in planning or committing it; or (c) [h]aving a legal duty to prevent the commission of the offense, fails to make proper effort so to do." N.J.S.A. 2C:2-6(c)(1)(a), (b), (c). "When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability." State v. Savage, 172 N.J. 374, 388 (2002). Our Supreme Court has held when a defendant is charged with first-degree armed robbery as an accomplice, the accomplice liability jury instruction must "clearly require the jury to find that defendant had shared the [principal's] purpose to commit a robbery with a weapon." Weeks, 107 N.J. at 405 (emphasis omitted).

In this case, the court instructed the jury in accordance with the model charges on first-degree robbery and accomplice liability. The court instructed the jury as follows:

> The State alleges that the defendant is legally responsible for the criminal conduct of . . . Lind in

27

violation of a law which reads in pertinent part as follows. A person is guilty of an offense if it is committed by his own conduct or the conduct of another person for which he is legally accountable or both. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of an offense. <u>A person is an accomplice of another purpose in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense</u>, he aids or agrees or attempts to aid such other person in planning or committing it. This provision of the law means that not only is the person who actually commits the criminal act responsible for it, but one who is legally accountable as an accomplice is also responsible. Now this responsibility as an accomplice may be equal and the same as he who actually committed the crimes <u>or there may be responsibility in a different degree depending on the circumstances as you find them to be</u> . . . .

[(Emphasis added).]

The court then attempted to explain the accomplice liability statute as applied to the facts:

In this case, the State alleges that . . . defendant is equally guilty of the crime committed by . . . Lind. Because he acted as an accomplice by aiding or agreeing or attempting to aid . . . Lind in the <u>planning or committing it with the purpose that the specific crime charged be committed.</u> In order to find the defendant guilty of the specific crime charged, the State must prove beyond a reasonable doubt each of the following elements. One, that . . . Lind committed the crime of robbery. [The court has] already explained the elements of robbery. Two, that this defendant did aid

or agree or attempt to aid . . . Lind in planning or committing the robbery. Three, that the defendant's purpose was to promote or facilitate the commission of the robbery. And, four, that this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act.

[(Emphasis added).]

The court repeated the fourth element of accomplice liability for a second and third time:

Remember that this defendant can be held an accomplice with equal responsibility only if you find as a fact that he possessed the criminal state of mind as required to be proved against the person who actually committed the criminal act. In order to convict the defendant as an accomplice for the specific crime charged, you must find that the defendant had the purpose to participate in that particular crime.

. . . .

One, that . . . Lind committed the crime of robber[y]. Two, that this defendant did aid or agree or attempt to aid . . . Lind in planning or committing it. Three, that this defendant's purpose was to promote or facilitate the commission of the offenses. Four, that this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act.

[(Emphasis added).]

The court emphasized the principal and the accomplice of the respective crime can have two different mental states:

> Our law recognizes that two or more persons may participate in the commission of an offense, but each may participate therein with a different state of mind. The liability or responsibility of each participant for any ensuing offense is depend[e]nt on his own state of mind. The liability or responsibility of each participant for any ensuing offense is depend[e]nt on his own state of mind and not anyone else's.

Here, the court clearly instructed the jury it must determine whether defendant's intent was not simply to commit a robbery but an armed robbery. Moreover, the court read the armed robbery charge contained in the indictment first to the jury before giving the instructions. The indictment included all of the elements of armed robbery and specifically explained the deadly weapon alleged to have been used was a handgun, followed by a definition for a firearm, which accordingly, instructed the jury defendant was charged with first-degree armed robbery not second-degree armed robbery. The indictment read to the jury explicitly stated, "that robbery is a crime of the second-degree except that it is a crime of the first-degree if the actor is armed with or uses or threatens the immediate use of a deadly weapon."

The court also repeatedly instructed, "[t]he liability or responsibility of each participant for any ensuing offense is dependent on his own state of mind

30

and not anyone else's," regarding the lesser-included offense of theft from a person and first-degree versus second-degree robbery. Thus, defendant has failed to show prejudice. Hock, 54 N.J. at 538.

We note defendant was not tried with Lind. While "[t]he fact defendant was tried alone is not dispositive," State v. Franklin, 377 N.J. Super. 48, 57 (App. Div. 2005), that fact makes it a more "remote possibility that [the jurors] were distracted from their task by a conclusion that the principal had possessed a more culpable intent than the accomplice." State v. Norman, 151 N.J. 5, 39 (1997). In addition, defendant maintained through this matter that he was not involved at all in the robbery. While this does not "eliminate[] the possibility that a faulty accomplice liability charge could have prejudiced him," State v. Cook, 300 N.J. Super. 476, 488 (App. Div. 1996), it does reduce the likelihood.

Considering the totality of the circumstances, including the entirety of the jury charges, the strength of the State's case, the nature of the defense, and the verdict sheet, we conclude that defendant failed to show the accomplice liability charge was inadequate under Weeks, 107 N.J. 386. Any omission of specific language was not "clearly capable of producing an unjust result." R. 2:10-2. The absence of prejudice is confirmed by defendant's failure to object to the charge as given.

V.

Citing <u>Hill</u>, 256 N.J. 266, defendant argues his first-degree witness tampering conviction should be reversed.  Defendant contends the court did not follow the principles pronounced in <u>Hill</u> and <u>Counterman</u> and should have provided a jury instruction that explained how to determine which category of unprotected speech his text messages to D.Z. fell under.  Defendant also maintains the court erred by not instructing the jury on the "higher" mens rea of recklessness or satisfaction based on an objective victim standard, which is required for a true threats prosecution.

N.J.S.A. 2C:28-5(a)(2) provides:

> a. A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted or has been instituted, he [or she] knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to . . .
>
> . . . .
>
> (2) <u>Withhold any testimony, information, document or thing</u>;
>
> . . . .
>
> Witness tampering is a crime of the first degree if the conduct occurs in connection with an official proceeding or investigation involving any crime enumerated in [N.J.S.A. 2C:43-7.2(d), including

32

robbery under N.J.S.A 2C:15-1] and the actor employs force or threat of force.

[N.J.S.A. 2C:28-5(a)(2) (emphasis added).]

Both the Federal and State Constitutions enumerate the right to free speech, but "permit[] restrictions upon the content of speech" in "a few limited areas." Counterman, 600 U.S. at 73 (quoting United States v. Stevens, 559 U.S. 460, 468 (2010)); U.S. Const. amends. I, XIV; N.J. Const. art. 1, ¶¶ 6, 18.  Our Supreme Court has recognized "historically unprotected categories of speech include[:]  fighting words, obscenity, child pornography, incitement, defamation, true threats, and speech integral to criminal conduct."  Hill, 256 N.J. at 281.  True threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular" person or group of people.  Fair, 256 N.J. at 229 (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)); Hill, 256 N.J. at 282 ("A true threat is speech that, when taken in context, objectively threatens unlawful violence.").

Defendant contends that the jury was required to determine if his speech was unprotected as a (1) true threat or (2) speech integral to criminal conduct.  However, defendant misconstrues our Supreme Court's holding in Hill.  Hill merely requires the jury to determine whether speech is unprotected or protected

33

under our New Jersey Constitution. Id. at 290-91. Therefore, the jury was required to find whether the elements under the statute were satisfied, or unsatisfied, the latter meaning the speech is protected. Ibid. In other words, the jury was not required to determine what form of witness tampering defendant was being prosecuted for, but whether he satisfied the elements under the subsection of the statute he was being prosecuted for based on the jury instruction. Ibid.

Next, defendant urges the relevant category of unprotected speech associated with his witness tampering charge was "true threats." In contrast, the State argues it additionally prosecuted defendant based on his speech, which constituted "speech integral to criminal conduct." First, defendant avers the indictment alleged "between March 9, 2022 and April 7, 2022," the date range of the text messages, he "did employ threats or threats of force, which a reasonable person would believe would cause D.Z. to withhold any testimony, information, document, or thing[.]" Second, the State charged defendant with first-degree tampering, thus suggesting he used a "threat of force." N.J.S.A. 2C:28-5(a)(2).

Further, throughout trial, the State relied on the content of the messages to D.Z., arguing defendant made threats of violence. For example, the State

argued in summation: "We are here today because of . . . what [defendant] threatened to do," "That's why he's trying to threaten [D.Z.] to get him to drop the charges," "[Defendant] was accessing [the TextFree application] . . . the very same time that [D.Z.] was getting threatening messages," "[Defendant] was . . . the one threatening," "We know he was threatening the victim," "[Defendant] sends the final threatening message[.]" The court instructed the jury on witness tampering using the model jury charge: "[t]he State contends that . . . defendant threatened force upon the victim and his family via electronic communication."

Since the relevant category of unprotected speech was "true threats," defendant argues the court was required to instruct the jury the State had to prove: (1) he acted with at least recklessness and (2) that a reasonable person similarly situated to D.Z. would find his words constituted a threat of violence. Counterman, 600 U.S. at 69, 82; Fair, 256 N.J. at 219-20, 232-33, 238. Defendant argues the jury instructions did not meet these requirements, and therefore, his conviction for witness tampering "must be vacated to ensure that the statute is constitutionally applied to him." We disagree.

First, the State did prosecute defendant for witness tampering based on his speech characterized as a true threat. The record shows defendant sent at least fifteen text messages to D.Z., stating, in relevant part: "drop all charges I'm not

35

going to say it again" "I have all your information and family information all businesses and addresses," "[I] won't tell you this again," "[I have] been watching you and your family for a good amount of time," "next conversation should be [you] dropped all charges other than that I will pay some[]one a visit [at] school[,] work, doesn't matter," "if you think I'm bluffing you rat I'll prove you wrong police can't save you so drop all charges today."

Defendant then proceeded to send D.Z. messages that included his mother's full name, the businesses he owned, and his home address. Defendant continued to tell D.Z., "you go to anymore law enforcement about this conversation . . . it [will] be a bigger problem," "drop them charges cause if not the same way they go down you going be f[*]cked remember that little rat," "I have every [New Jersey] address and this will be just like a movie," "I [will] show you how big boys play in these streets rat." He continued, "before I lost some[]one to a chump like you to jail I'll hurt you real bad and your mom[] so I [dare] you to run back to police," and "I see you don't listen so I [will] show you how long my arm is today."

In Counterman, the United States Supreme Court held that a true threats prosecution "requires proof that the defendant had some subjective understanding of the threatening nature of his statements." 600 U.S. at 69.

36

Although a "specific intent to threaten the victim" is not required, the jury is required to find a mens rea of <u>at least recklessness</u> to convict the defendant. <u>Id.</u> at 73. Accordingly, the State must prove "the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." <u>Id.</u> at 69.

In <u>Fair</u>, our Supreme Court adopted the <u>Counterman</u> standard for true threats prosecution under our State Constitution. <u>Fair</u>, 256 N.J. at 228-37. Our Supreme Court described how, in a true threats prosecution, "a mens rea of recklessness suffices for purposes of . . . Article I, Paragraph 6 of the New Jersey Constitution." <u>Id.</u> at 233. The <u>Fair</u> Court stated recklessness means "a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway,'" which "involv[es] a deliberate decision to endanger another." <u>Ibid.</u> (quoting <u>Counterman</u>, 600 U.S. at 233). Indeed, "reckless defendants have done more than make a bad mistake. They have consciously accepted a substantial risk of inflicting serious harm." <u>Id.</u> at 233 (quoting <u>Counterman</u>, 600 U.S. at 80).

The <u>Fair</u> Court held that, "[i]n addition to a subjective mens rea of at least recklessness, we hold that an objective component is necessary for a prosecution for a threat of violence . . . to survive First Amendment and Article I, Paragraph

scrutiny." Id. at 237. The Fair Court also stated, the "objective inquiry," is "the State must prove that a reasonable person similarly situated to the victim would have viewed the message as threatening violence." Id. at 220. Defendant argues the court instructed the jury the "threat of force" should be considered from the standpoint of an "ordinary person," however, Fair specifically rejected such a standard. Id. at 237-39.

The court provided the following jury instruction, in pertinent part, on witness tampering based on true threats:

> The second element that the State must prove beyond a reasonable doubt is that the defendant knowingly engaged in conduct that a reasonable person would believe would cause a witness to withhold any testimony, information, document or thing.
>
> A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware of his conduct is of that nature or that such circumstances exist or he is aware of a high probability of their existence. . . .

The court then explained the definition of knowingly and knowledge in further detail:

> Our statute provides that tampering with a witness is a crime of the third-degree, except that it is a crime of the second-degree if the actor employed force or the threat of force. If you find that the State has proven the defendant guilty beyond a reasonable doubt of this crime, then you must determine whether or not the State

> has proven beyond a reasonable doubt that the defendant employed force or <u>threat of force. . . . Threat of force means that the words or actions of the defendant must be of such a nature as to convey menace or fear or force to the ordinary person.</u>  The State contends that the defendant threatened force upon the victim and his family via electronic communication.  If you find that the State has proven beyond a reasonable doubt that the defendant employed force or threat of force then you must find him guilty of tampering with a witness in the second-degree. . . . It is a crime of the first-degree if the actor employed force or the threat of force and the conduct occurred during and official proceeding or investigation involving a crime enumerated in a portion of our statutes codified in N.J.S.A. 2C:43-7.2.
>
> [(Emphasis added).]

Therefore, although the court did not instruct the jury to find a mens rea of recklessness or the proper objective victim standard, we are confident the jury would have still returned a guilty verdict.  The court instructed the jury on an even higher mens rea that was required—knowingly, and the contents of defendant's speech would have led any jury to find that a reasonable person similarly situated to D.Z. would review defendant's messages as threatening. <u>Fair</u>, 256 N.J. at 220.

Second, although the State prosecuted defendant for witness tampering based on true threats, the evidence also supports a prosecution for same based on "speech integral to criminal conduct" as defined in <u>Hill</u>, 256 N.J. at 282

39

(quoting United States v. Hansen, 599 U.S. 762, 783 (2023)).  However, unlike Hill, defendant's speech here was not "facially innocuous" speech.  Id. at 291.  Clearly, defendant "explicitly threaten[ed]" D.Z. not to "cooperate with [the] investigator."  Hill, 256 N.J. at 286-87.  Therefore, the court was not required to instruct the jury that it was required to find defendant subjectively intended his communications to D.Z. to cause him to drop the charges and not cooperate with law enforcement.

Moreover, the uncontroverted record demonstrates defendant repeatedly told D.Z. to "drop all charges" more than once, buttressed with threats targeted at D.Z. and his mother.  Consequently, there was no plain error under Rule 2:10-2.

VI.

In another challenge to his convictions, defendant contends that even if all his other arguments individually do not warrant reversal, cumulatively they do.

The cumulative error doctrine provides that when a combination of errors "casts doubt . . . on the propriety of the jury verdict" and "prejudice[s] the fairness of defendant's trial," reversal may be warranted.  State v. Jenewicz, 193 N.J. 440, 473-74 (2008).  In other words, a defendant is entitled to a fair trial,

and when multiple errors collectively undermine this fairness, a new trial will be required.  State v. Reddish, 181 N.J. 553, 615 (2004).  Conversely, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair."  State v. T.J.M., 220 N.J. 220, 238 (2015) (quoting State v. Weaver, 219 N.J. 131, 155 (2014)).

Here, we discern no cumulative errors warranting a reversal of defendant's convictions.  As we have analyzed, each of defendant's arguments individually fail.  Indeed, most of them are not supported by the record and law.  To the extent that there were any errors, they were harmless and in combination they did not result in an unfair trial.

VII.

Defendant's contention that his extended-term sentence as a persistent offender must be remanded based on the United States Supreme Court's decision in Erlinger v. United States, 602 U.S. 821, 835 (2024), is not convincing.  In Erlinger, the Court held that a defendant is entitled under the Fifth and Sixth Amendments to have a jury unanimously determine, beyond a reasonable doubt, whether the defendant's past offenses were "committed on occasions different from one another."  602 U.S. at 835.  Applying principles first announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), the Court reiterated "there is no

41

doubt what the Constitution requires in these circumstances: Virtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Erlinger, 602 U.S. at 834 (alteration in original) (quoting Apprendi, 530 U.S. at 490).

It is not disputed that Erlinger abrogated New Jersey's persistent offender statute to the extent N.J.S.A. 2C:44-3(a), as presently drafted, provides that certain predicate facts are to be found by a court rather than a jury. However, our Supreme Court in State v. Carlton, 262 N.J. 629, 643 (2026), concluded that "errors in failing to submit sentencing factors or elements to a jury, as in Apprendi and its progeny, are presumptively subject to harmless error analysis, not automatic reversal." The Court thus held the harmless constitutional error doctrine applies to Erlinger violations provided that "the relevant facts are undisputed, the sentencing court's reasoning fully articulated, and the record demonstrates, beyond any reasonable doubt, the sole conclusion a jury could have reached had Erlinger been in place at the time of sentencing." Id. at 644. Stated another way, the record must demonstrate that only one outcome would have been possible at trial. Id. at 645.

42

Pursuant to N.J.S.A. 2C:44-3(a), a defendant "convicted of a crime of the first, second[,] or third degree" may, "upon application of the" prosecutor, be sentenced to an extended term of imprisonment if the defendant is found to be a "persistent offender." It states:

> A persistent offender is a person[,] who at the time of the commission of the crime is [twenty-one] years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he [or she] was at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.
>
> [N.J.S.A. 2C:44-3(a).]

In this case, the relevant facts are undisputed, the court's reasoning was fully articulated, and the record demonstrates, beyond any reasonable doubt, the sole conclusion a jury could have reached had Erlinger been in place at the time of sentencing is that defendant was a persistent offender. In its oral opinion granting the State's motion for an extended term, the court found defendant, who was over twenty-one years of age when the offenses at issues in this case were committed, had been convicted of at least two prior indictable crimes on separate occasions, including burglary, grand larceny, criminal possession of a weapon and bail jumping in New York, and identity theft in Pennsylvania. These

offenses occurred when defendant was between nineteen to thirty-three years old. Defense counsel conceded that defendant was eligible for an extended term under the statute. In addition, the persistent offender statute only requires two prior adult convictions to render defendant eligible for an extended-term sentence, whereas defendant had multiple prior felony convictions. There is no reason for us to conclude the court misapplied its discretion in imposing the extended-term sentence.

The court's findings are amply supported by defendant's undisputed criminal record. Thus, pursuant to Carlton, we are satisfied the Erlinger violation in this case was harmless, and a remand is unnecessary.

VIII.

We reject defendant's argument that the court failed to consider the disparity in his sentence for first-degree robbery compared to Lind's sentence for the same crime—an eight-year term of imprisonment with a 6.8-year parole bar.

Our "standard of review of a sentencing decision is well-established and deferential." State v. Vanderee, 476 N.J. Super. 214, 235 (App. Div. 2023). We review a trial court's sentencing decision under an abuse of discretion standard. State v. Konecny, 250 N.J. 321, 334 (2022). We must not "'substitute [our]

44

judgment for that of the sentencing court.'" Vanderee, 476 N.J. Super. at 235 (alteration in original) (quoting State v. Liepe, 239 N.J. 359, 370 (2019)).

In determining a sentence for imprisonment, the sentencing judge must consider the aggravating factors delineated in N.J.S.A. 2C:44-1(a)(1)-(15) and the mitigating factors set forth in N.J.S.A. 2C:44-1(b)(1)-(14). "[A] trial court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989). "[A]n appellate court should not second guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record." Id. at 216.

In this case, the court found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (the risk defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (the extent of defendant's prior criminal record and seriousness of offenses); nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter defendant and others from violating the law); and thirteen, N.J.S.A. 2C:44-1(a)(13) (the defendant, while in the course of committing the crime, including flight therefrom, used or

was in possession of a stolen motor vehicle). The court did not find any applicable mitigating factors applied.

The court's findings regarding the aggravating and lack of mitigating factors are supported by substantial evidence in the record, and the court appropriately applied and balanced those factors in imposing its sentence. As for defendant's claim of disparate sentences, that argument is likewise unavailing. We recognize Lind received a comparably lesser sentence, but he pled guilty to first-degree robbery and second-degree unlawful possession of a weapon. After Lind was sentenced, the State filed a superseding indictment against defendant, who chose to go to trial.

Notwithstanding Lind's role in the robbery and his guilty plea to first-degree robbery, the court sentenced him in the second-degree range. The jury found defendant guilty of second-degree conspiracy to commit robbery, first-degree robbery as an accomplice, third-degree theft, and first-degree witness tampering.

Given these differences, there is insufficient proof of disparity to set aside defendant's sentence. See State v. Roach, 146 N.J. 208, 232-33 (1996). Defendant manifestly received an "individualized assessment" as prescribed by the law. State v. Zuber, 227 N.J. 422, 450 (2017). Defendant's sentence was

compliant with statutory and constitutional guidelines and does not shock the judicial conscience.

Finally, we remand to correct, with the State's consent, the JOC on count one because the court merged count one into count two but then incorrectly imposed a sentence on count one. On remand, the trial court should correct the JOC by deleting the sentence on count one.

All other points raised in this appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed but remanded to correct the JOC. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division